UNITED STATES of America, Plaintiff-Appellee,

v.

Edwin CLAY and Arthur John Sweeney, Jr., Defendants-Appellants.

No. 73–1090.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 16, 1973.

Decided March 1, 1974.

William J. Stevens, Chicago, Ill., for defendants-appellants.

James R. Thompson, U. S. Atty., William T. Huyck, Mary L. Sfasciotti, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, Chief Judge, CASTLE, Senior Circuit Judge, and SPRECHER, Circuit Judge.

CASTLE, Senior Circuit Judge.

Defendants Edwin Clay and Arthur John Sweeney, Jr., appeal their jury convictions for conspiring to attempt to enter and attempting to enter a savings and loan association. On appeal, the men contend that the police lacked probable cause to arrest them, that evidence regarding prior criminal conduct was erroneously admitted, and that the court's instruction improperly failed to distinguish between "mere preparation" and "attempt." Clay and Sweeney also assert that they were deprived of the opportunity to interview accomplice witness Kelly and denied material relating to whether leniency was offered to Kelly. Finally, they raise the question of whether a conspiracy indictment may properly charge a conspiracy to attempt a crime. We have considered these issues, and we affirm the convictions.

The criminal activity in question grew out of a romance between Sweeney and Miss Charlotte Boedecker, a cashier in the Argo Savings and Loan Association in Summit, Illinois, which began in July 1972. Shortly thereafter, Sweeney began to pressure Miss Boedecker to embezzle travelers checks from the savings and loan. On Sweeney's assurance that the checks would be covered, Miss Boedecker took checks from Argo on two occasions in early August. On August 16, Clay, Sweeney's friend, offered some of the embezzled checks to Kelly. He also asked Kelly to assist Sweeney and him in "sticking-up" the source of the checks. The following day, the foursome met and discussed a daylight robbery of Argo. Kelly questioned Miss Boedecker on the layout of the building, and Miss Boedecker asked Kelly to scatter the travelers checks during the robbery. On the afternoon of August 18, Kelly and Clay appeared outside the savings and loan building. However, they decided to postpone their proposed action because of their visibility to passersby. After work, Miss Boedecker was picked up by Sweeney, and she gave him the key to her cash drawer in the Argo vault as they drove to a rendezvous with Kelly and Clay. At that meeting, the four decided to burglarize the savings and loan that evening. The three men proceeded to the building; en route, Sweeney told the other two men that Miss Boedecker had left the vault open to permit the cover-up of the checks. Kelly removed a sledge hammer from the car trunk on arrival, while Sweeney took out a hand drill, pry-bar, screwdriver, gloves and a flashlight. Most of the tools were placed near a guard rail bordering the savings and loan's adjacent parking lot. Sweeney unsuccessfully attempted to drill a hole in the back door of the building. When he reported his failure to Kelly and Clay, Kelly decided to inspect the door, leaving Clay and Sweeney sitting on the guard rail. When Kelly returned to speak with the two men, he dropped a screwdriver at their feet as a police car approached. To mask the enterprise as simply horseplay, Kelly grabbed one of the men's hats and began running. The police, who had observed Clay and Sweeney sit-

ting on the guard rail next to the closed building an hour earlier, became suspicious and decided to investigate. While speaking with the two men, the officers noticed burglary tools strewn at the men's feet and arrested them.

 Following their arrest, Clay and Sweeney were escorted to the police station where they were asked to empty their pockets. Clay had drill bits in his possession, while Sweeney surrendered a Mosler safe key. This key was subsequently identified as the one opening Miss Boedecker's cash drawer in the vault. Following an evidentiary hearing on a motion to suppress, the trial court admitted the key into evidence. It is well established that "a search without a warrant is, within limits, permissible if incident to a lawful arrest; if an arrest without a warrant is to support an incidental search, it must be made with probable cause." Henry v. United States, 361 U.S. 98, 102, 80 S.Ct. 168, 171, 4 L.Ed.2d 134 (1959). Clay and Sweeney assert that because no probable cause existed to support their arrests, the fruits of the search were inadmissible into evidence. See, e. g., Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The authority of police officers to make felony arrests without a warrant is restricted to offenses committed in their presence or to situations where the officers have reasonable grounds to believe that the person to be arrested has committed or is committing a crime. Henry v. United States, supra, 361 U.S. at 100, 80 S.Ct. 168. Neither rumor, report nor suspicion is adequate to support an arrest; "[p]robable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense had been committed." Id. at 102, 80 S.Ct. at 171. The facts and circumstances which confronted the officers were clearly sufficient for them to believe prudently that Clay and Sweeney were engaging in criminal activity. At 9:30 in the evening of August 18, 1973, the police noticed Clay and Sweeney sitting on a guard rail at the north corner of an empty parking lot adjacent to the closed savings and loan, approximately 140 feet from the building's rear doors. About an hour later, the officers saw the two men still sitting on the guard rail, only now at the south corner, about 48 feet from the rear doors. The officers then observed a third man walk from the direction of the rear of the bank toward the seated men, drop or place something at their feet, grab one of the men's hats, and begin running in a direction away from the police. When neither man appeared to object to the loss of the hat, the officers became suspicious about this pattern of behavior and appropriately decided to inquire about the men's identities and their purpose for remaining near the rear of the building at such a late hour. While speaking with the two, an officer holding a flashlight noticed a pistol lying a foot behind Sweeney, and a crowbar, a screwdriver and a pair of gloves lying just to the right of Clay. The arrests followed.

Clay and Sweeney contend the only suspicious conduct the officers observed was that of Kelly. Yet, the officers testified that their suspicions were initially aroused by two men remaining near a closed savings and loan building for over an hour with no apparent purpose, while progressively moving along the guard rail closer to the rear doors of the building. Clay and Sweeney also contend that Kelly's conduct was extraneous to a finding of probable cause, since the police had no knowledge that Kelly was not a stranger to the men. However, it was the men's reaction to Kelly's acts, not merely his conduct, which heightened police suspicion. The officers had observed that Kelly's actions brought no apparent response from the men. Surely, if Kelly were a stranger, the "theft" of the hat would not have been calmly tolerated, and the dropping or placing of a screwdriver of a size useful in breaking into a building might have engendered surprise. This conduct plainly justified the officers' initial inquiry.

The arrests, however, were predicated on the observance of the burglary tools

which lay at the men's feet, for possession of burglary tools is a crime in Illinois. Ill.Rev.Stat., ch. 38, sec. 19–2. Clay and Sweeney argue that an essential element of the crime is knowledgeable possession, and nothing indicated to the police that the two men were aware of the tools which lay in their proximity. *See,* Illinois v. Cogwell, 8 Ill.App.3d 15, 288 N.E.2d 729 (1972). The Illinois Criminal Code provides the following definition of possession:

> Possession is a voluntary act if the offender knowingly procured or received the thing possessed or was aware of his control thereof for a sufficient time to be able to terminate his possession. Ill.Rev.Stat. ch. 38, sec. 4–2.

When Kelly dropped or placed something at the feet of Clay and Sweeney, the police observed that the two men did not disassociate themselves from the object, though obviously aware of their control over it. When the police shined their light at the men's feet, they viewed an array of burglary tools. The officers could therefore reasonably infer that Clay and Sweeney had knowingly received at least one of the tools from Kelly. Even if the evidence may have been insufficient to sustain convictions, the standard for probable cause has never been equated with the standard for conviction. *E. g.,* Lewis v. United States, 135 U.S.App.D.C. 187, 417 F.2d 755 (1969); Locke v. United States, 11 U.S. (7 Cranch.), 339, 348, 3 L.Ed. 364 (1813) (Marshall, C. J.). In the circumstances of this case, the finding of burglary tools adjacent to two men who had remained suspiciously close to a closed savings and loan association for more than an hour was sufficient to give the officers reasonable grounds for believing that Clay and Sweeney knowingly possessed burglary tools [1] and, hence, for the arrests.

■■■ Clay and Sweeney contend that the court erroneously permitted the government to introduce evidence of prior crimes not charged in the indictment. The evidence consisted of Miss Boedecker's embezzlement of travelers checks from Argo at Sweeney's behest and of the agreement among Miss Boedecker, Clay, Kelly and Sweeney to rob the savings and loan during daylight hours. Clay and Sweeney assert that the evidence prejudicially caused the jury to convict them for unrelated crimes not charged in the indictment.[2]

1. There may also have been probable cause to arrest the men for attempted bank robbery in violation of 18 U.S.C. § 2113(a), a question we need not reach because of our holding that probable cause existed to arrest the men for possession of burglary tools, and "in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under the Amendment." United States v. Robinson, 414 U.S. 218, 235, 94 S. Ct. 467, 477, 38 L.Ed.2d 427 (1973). The facts in our case resemble those in McClard v. United States, 386 F.2d 495 (8th Cir. 1967), cert. den., sub nom., Ussery v. United States, 393 U.S. 866, 89 S.Ct. 149, 21 L.Ed.2d 134 (1968), in which the court found probable cause to arrest a man sitting in a pickup truck parked in front of a bank in the early hours of the morning when a weapon was found lying on the front seat of the truck. As in the present case, the police saw others (previously observed by witnesses "messing with the [bank's] door") running from the bank area in a direction away from the police. In finding probable cause, the court stated, "It is common knowledge that burglars and those intent on predatory practices often carry and have at their command loaded guns." *Id.* 386 F.2d at 501. While there were no reports of tampering with the doors in this case, the men were found proximate not only to a loaded weapon but also to a whole array of burglary tools. *See also,* Golliher v. United States, 362 F.2d 594 (8th Cir. 1966).

2. Clay and Sweeney contend that as the indictment failed to allege embezzlement, conspiracy to conceal embezzlement or conspiracy to rob, though evidence of these crimes was presented as overt acts of conspiracy, they would be liable for subsequent prosecution for these acts, which would subject them to double jeopardy. The prospective risk of double jeopardy, however, does not bar the introduction of relevant evidence encompassing possibly criminal acts in the first trial, and we need not consider at this time whether a later trial on any of the above charges would violate the constitutional clause.

While proof of prior unrelated crimes may not be introduced to imply guilt respecting the crime charged, United States v. Boyd, 142 U.S. 450, 12 S.Ct. 292, 35 L.Ed. 1077 (1892), proof of criminal conduct may be introduced when a conspiracy is alleged if such proof establishes any act to effect the object of a conspiracy, Braverman v. United States, 317 U.S. 49, 53, 63 S.Ct. 99, 87 L.Ed. 23 (1942); Bannon v. United States, 156 U.S. 464, 468–469, 15 S. Ct. 467, 39 L.Ed. 494 (1894); and such acts need not involve more than one of the charged conspirators. In the present case, Clay and Sweeney were charged with a conspiracy beginning on August 1, 1972 to enter the Argo Savings and Loan Association with the intent to commit larceny. Subsequent to the date on which the conspiracy was formed, Sweeney persuaded Miss Boedecker to embezzle checks by promising to cover the resulting shortage through a later robbery. Kelly was enticed into the conspiracy through the use of these checks; he was offered some of the checks and asked to help "stick-up" the savings and loan. Miss Boedecker gave detailed information on the building's floor plan to facilitate the daylight robbery designed to effect the cover-up for the embezzled checks. Thus, both the embezzlement and the agreement to rob the savings and loan contributed to achieving the object of the charged conspiracy by providing the means both for inducing the necessary participation and for obtaining essential building information. That these overt acts provided at trial were not alleged in the conspiracy indictment is of no consequence on the facts presented here. Brulay v. United States, 383 F.2d 345 (9th Cir. 1967), cert. den., 389 U.S. 986, 88 S.Ct. 469, 19 L.Ed.2d 478 (1967); Finley v. United States, 271 F.2d 777 (5th Cir. 1960). Because these events, obviously relevant to the object of the conspiracy charged, transpired after the date on which the indictment alleged the conspiracy was formed, Clay and Sweeney received adequate notice that evidence of these events might be presented to the court.

We need not rest on the ground alone, however, in holding that evidence of the embezzlement and agreement to rob was properly admitted. The use of prior criminal conduct to prove intent or motive is a well-established exception to the general rule. C. McCormick, Law of Evidence, § 157 (1954). Proof of the embezzlement established in a rather emphatic manner at least one motive for the attempted burglary—the need to shield Miss Boedecker's pilfering. Further, proof of the attempted robbery was inextricably linked to proof of the attempted burglary and was therefore properly admitted. As this court has stated:

> . . . evidence of other criminal acts has been held admissible by this court when they are so blended or connected with the one on trial as that proof of one incidentally involves the other; or explains the circumstances thereof; or tends logically to prove any element of the crime charged. Such evidence is admissible if it is so related or connected with the crime charged as to establish a common scheme or purpose so associated that proof of one tends to prove the other, or if both are connected with a single purpose and in pursuance of a single object; as well as to establish identity, guilty knowledge, intent and motive. United States v. Wall, 225 F.2d 905, 907 (7th Cir. 1955), cert. den., 350 U.S. 935, 76 S.Ct. 307, 100 L.Ed. 816 (1956).

Proof of the attempted robbery explains both how the necessary information on the building layout was obtained and why the mode of nighttime entry was chosen. It also tends to prove the identity of the participants.

Clay and Sweeney's claim of prejudice arising from the introduction of evidence of criminal conduct to establish overt acts pursuant to the conspiracy is strikingly similar to that asserted by

the appellant in United States v. Pullings, 321 F.2d 287 (7th Cir. 1963). In that case, it was argued that the jury had heard evidence of charges unrelated to the conspiracy, as a result of the joining of counts alleging both narcotics sales and conspiracy to violate the narcotic laws with narcotic sales listed as overt acts. The court found that a substantive count in an indictment may relate to an overt act in a conspiracy count in the same indictment and concluded that the appellant's claim of prejudice lacked merit. Here, the possibility of prejudice is far more remote, for the jury is not presented with the nexus of criminality apparent when it is asserted that acts in furtherance of a conspiracy are in themselves legally sufficient to constitute crimes. If there is no resulting prejudice in the *Pullings* context, it would be hard to imagine prejudice resulting from the mere introduction of proof of overt acts where the government has not associated such acts with criminal sanctions.

In conference, counsel for Clay and Sweeney tendered an instruction to the court, stating, "The word 'attempt' used in my instructions means a substantial step toward the completion of an act. Merely preparing to do something is not an attempt." The court indicated that the instruction would be given to the jury. Subsequently, the court instructed the jury, in pertinent part: "The word 'attempt' used in this instruction means a substantial step toward the completion of an act." Clay and Sweeney contend that the instruction failed to present fairly the law regarding their theory of the case, because the jury was not specifically informed of the distinction between "preparation" and "attempt." Clearly, Clay and Sweeney were entitled to have the question of an attempt to enter the Argo Savings and Loan Association submitted to the jury with appropriate instructions covering whether the conduct of the men had reached the point where an overt act directly tending to effect the commission of the substantive offense, Mims v. United States, 375 F.2d 135, 148 (5th Cir., 1967), and strongly corroborative of criminal purpose, United States v. Butler, 204 F.Supp. 339, 344 (S.D.N.Y. 1962); A.L.I. Model Penal Code, had been committed. But this test need not be phrased in terms of an attempt-preparation dichotomy. In fact, the utility of such a distinction is questionable. Mr. Justice Holmes succinctly comprehended the difficulties in the distinction in Commonwealth v. Peaslee, 177 Mass. 267, 59 N.E. 55, 56 (1901), "Preparation is not an attempt. But some preparations may amount to an attempt. It is a question of degree." The Fifth Circuit has noted, "Much ink has been spilt in an attempt to arrive at a satisfactory standard for telling where preparations end and attempts begin." Mims v. United States, *supra*. Clay and Sweeney's theory was simply that their conduct did not amount to an attempt. By properly instructing the jury on the standard of conduct which constitutes attempt (while avoiding the quagmire created by the preparation-attempt distinction), the court correctly permitted the jury to evaluate Clay and Sweeney's assertion that their conduct was legally insufficient to warrant a determination that they attempted to enter the building.

Clay and Sweeney next contend that the court erred in failing to give their tendered instruction after notifying counsel that the instruction would be read to the jury. The men base this argument on rule 30 of the Federal Rules of Criminal Procedure, which provides *inter alia*: "The court shall inform counsel of its proposed action upon the requests [for jury instructions] prior to their arguments to the jury." As three circuits have recognized, "The obvious object of the rule in point is to require the judge to inform the trial lawyers in a fair way what the charge is going to be, so that they may intelligently argue the case to the jury." Ross v. United States, 180 F.2d 160, 165 (6th Cir. 1950); Downie v. Powers, 193 F.2d 760, 766–767 (10th Cir. 1951); Wright v. United States, 339 F.2d 578,

580 (9th Cir. 1964). The degree of specificity required by the rule, however, need not be great. "The court may inform counsel in general terms suitable to this purpose [stated above] and need not, and we think, should not, do so in a sentence-by-sentence outline." Martin v. United States, 404 F.2d 640, 643 (10th Cir. 1968). The court here informed counsel of his proposed action on the tendered instructions and read to the jury the instruction defining attempt. He deleted as preemptory and argumentative only the sentence relating to preparation, apparently recognizing that the semantic overlap suggested by Holmes might preclude the jury from considering Clay and Sweeney's liability for conduct which might be legally sufficient to constitute attempt even though factually described as preparation. Because the trial court's announcement permitted counsel to make intelligent presentations to the jury predicated on the standard of liability subsequently enunciated for the jury, the court satisfied the rule.

▆▆▆ Even assuming that the failure to inform Clay and Sweeney's counsel of the intended deletion prior to counsel's argument before the jury constituted error, it lacked the prejudice necessary to constitute reversible error. "The standard [which] is usually described is whether the party was unduly and unfairly prevented from making his argument to the jury or was substantially misled by the court's action or inaction in formulating his argument." Whitlock v. United States, 429 F.2d 942, 946 (10th Cir. 1970). Clay and Sweeney assert that they were misled by the court's ruling and as a consequence argued the distinction between attempt and preparation to the jury. Because the distinction was not drawn in the charge to the jury, they contend, the jury could have concluded that it was immaterial to their determination of issues of fact. The precise theory of the defense was that Kelly, not Sweeney, drilled the hole in the lock of the building's back door and that Clay and Sweeney's presence adja-

cent to the building, coupled with their placing burglary tools in nearby bushes, was legally insufficient to constitute attempt. The defense argued to the jury, "A person can be ready to do something, but unless he actually tries to make the entry, that is not an attempt. . . . And I submit to you that when you think about what was actually done here, you will see that unloading the tools was not any more than getting ready, preparation." The defense argument thus paraphrased the defendant's instruction which was read to the jury. This instruction provided that attempt meant a substantial step toward the completion of an act and that, by negative implication, any conduct short of this standard, whatever its denomination (e. g., "getting ready" or "preparation"), would not give rise to legal liability. Because the court clearly instructed the jury on the proper standard of liability, the jury could not have ignored as immaterial respective counsel's characterization of the facts with regard to that standard, even if it could have ignored labels for insufficient evidence to meet the required burden of proof for conviction. It is therefore inconceivable that notification of the alteration in the instruction would have affected the tenor of the defense argument.

The cases on which Clay and Sweeney rely are inapposite. In Wright v. United States, 339 F.2d 578 (9th Cir. 1964), the court found reversible error where the trial court answered counsel's request for information on the content of instructions with "go ahead and argue the case any way you want to argue it . . . [,and] I will instruct the jury as to the law involved in this case." Id. at 579. The trial court then ignored the defense theory that defendant was acting within the scope of permission in this Dyer Act prosecution. The court, however, expressly distinguished this refusal to provide any guidance for counsel from Carbo v. United States, 314 F. 2d 718, 745–746 (9th Cir. 1963), and Watada v. United States, 301 F.2d 869 (9th Cir. 1962), in which the court had

found that the trial court's refusal to comply with rule 30 did not appear to affect the content of counsel's argument. This latter finding is applicable here, where the court accepted the standard of liability proposed by the defense, deleting only a term describing nonculpatory conduct, and counsel then proceeded to shape his closing argument toward characterizing the pertinent facts as insufficient to meet the standard. Loveless v. United States, 104 U.S.App.D.C. 157, 260 F.2d 487 (1958), is also not in point. There, trial counsel was told that the jury would be instructed on second degree murder; however, the jury was instructed on manslaughter. In *Loveless*, the defense protested that in reliance on the court, he had refrained from arguing the manslaughter issue to the jury, and the case was properly reversed. Here, the reliance of counsel on the court was not substantially misplaced. The court gave the promised instruction on the standard for criminal conduct to the jury, implying that lesser conduct was not inculpatory, and counsel relied on the distinction in conduct created by the standard. In a similar situation where the trial court failed to inform counsel of its proposed action on a requested intrapment instruction but subsequently issued its own instruction, the First Circuit, in language equally applicable here, decided that as "the court below adequately covered the ground . . . [,w]e fail to see how counsel in this case would significantly have changed the thrust of his argument had the court specifically stated that it would not give the instructions in the form requested." Carrigan v. United States, 405 F.2d 1197, 1198 (1st Cir. 1969).

 Prior to arraignment, Kelly was incarcerated at the Milwaukee County Jail on an unrelated state charge of burglary. Subsequent to arraignment, Miss Boedecker filed a "Motion to Interview Accomplice Witness," which sought to have the United States Attorney produce Kelly, "who is presently in the custody of the Government [,] for an interview." Clay and Sweeney were granted leave to join the motion, which was denied. Clay and Sweeney now assert that the trial court and the U. S. government interfered with their right of access to government witnesses and thus abridged their right to effective representation by counsel, secured by the sixth amendment, and their right to a fair trial, secured by the fifth amendment. Miss Boedecker's motion, however, failed to properly recognize the structure of our federal system. While it is true that Kelly was in the custody of "the government," he was being held by Wisconsin state authorities at all pertinent times rather than by the United States government, which prosecuted this case. Because of this distinction, it was necessary for the United States Attorney to seek district court orders for a writ of habeas corpus and prosequendum to secure Kelly's presence at the trial. As the government had no more control over the presence of Kelly than did Clay and Sweeney, the court properly denied the motion. Nothing in the record suggested that Clay and Sweeney were unable to locate Kelly or that Kelly was forbidden by the prosecution from speaking with the defense.

 Clay and Sweeney assert that the court erred in denying their posttrial motion based on 18 U.S.C. § 3500 to order the government to furnish them with alleged notes of Kelly's answers to questions propounded by the prosecutor in a pretrial interview. The statutory purpose of the section is to delimit the possible reach of Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L. Ed.2d 1103 (1957), by providing for the "[turning] over to the defense at the time of cross-examination [statements of witnesses to government agents] if their contents related to the subject matter of the witness' direct testimony." Palermo v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959). Because the defendants could only properly use such a statement to impeach the testimony of Kelly during cross-examination, the motion for production made at the conclusion of the trial was not

timely. Therefore, we find no error in the court's denial of the motion. United States v. Trigg, 392 F.2d 860 (7th Cir. 1968); cert. den., 391 U.S. 961, 88 S.Ct. 1863, 20 L.Ed.2d 874 (1968).

While the original purpose of the motion for production of the prosecutor's notes was to elicit information concerning Kelly's plans and efforts to enter the savings and loan, the men claim on appeal that disclosure of the notes would have permitted them to determine whether Kelly received a promise of leniency in exchange for his testimony, Kelly having denied on cross-examination that he was testifying as part of a bargain to reduce his sentence. If Clay and Sweeney could demonstrate through the use of the notes that Kelly lied under oath and that the government knowingly permitted the perjured testimony to go uncorrected, a new trial would be mandated under Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Even if it were procedurally appropriate to use a § 3500 motion to produce post-trial evidence related to the use of perjured testimony, there is no basis to suggest that an evidentiary hearing would be warranted here as nothing has come to light since the defendants filed their post-trial motion to intimate that the prosecutor's questions to Kelly related to anything other than Kelly's plans and efforts regarding the Argo Savings and Loan Association. This sharply contrasts with the facts in *Giglio*, where the motion for a new trial was grounded on demonstrable new evidence: conflicting affidavits filed by two assistant United States attorneys.

Finally, Clay and Sweeney challenge the sufficiency of the indictment alleging a conspiracy to attempt to enter the Argo Savings and Loan Association on the ground that an attempt is an inchoate offense and cannot properly be the objective of a conspiracy. They assert that if the object of the conspiracy was to be completed when the unsuccessful attempt had been made, then the object of the conspiracy would be fulfilled before any actual threat to the bank's property had occurred. It is well-settled that a single conspiracy may have a multiplicity of objects, Pinkerton v. United States, 328 U.S. 640, 643, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), United States v. Manton, 107 F.2d 834 (2d Cir. 1938). All of the multifarious objects of the conspiracy need not be alleged to satisfy the statutory requirement for a criminal conspiracy under 18 U.S.C. § 371; however, the object alleged must be an "offense against the United States." While entering the savings and loan was obviously an objective of the conspiracy and a federal crime, the men necessarily contemplated their attempting to gain entry into the building, and such attempts are expressly proscribed by 18 U.S.C. § 2113(a). As the pleading thus alleged an "offense against the United States" as the object of the conspiracy, the defendants' contention is without merit.

Affirmed.

SWYGERT, Chief Judge (dissenting).

I dissent on the single ground that the trial judge clearly did not comply with Rule 30 of the Federal Rules of Criminal Procedure to the prejudice of the defendants, depriving them of a fair trial.

The facts briefly restated are as follows. Defendants were part of a conspiracy to burglarize a savings and loan association in Summit, Illinois. Although their efforts were aborted, they were indicted and convicted of conspiracy to attempt to enter the bank and the substantive crime of attempting to enter the bank. At trial, defendants admitted that they set out to burglarize the bank, but that they retreated from such an intention before they were arrested. They denied that either of them had taken any action to break into the bank, specifically they claim that neither had drilled a hole in the lock of the building. A co-conspirator, Ernest Kelly, testified that the defendant Sweeney did, in fact, drill a hole in the lock of the bank door.

It is undisputed that the defendants did unload burglary tools intended to be utilized before they decided to call a halt to their actions.

With respect to the events surrounding the noncompliance with Rule 30, the following should be considered. In conference prior to the final summations, the trial judge stated that the following instruction tendered by defendants would be given:

> The word "attempt" used in my instructions means a substantial step toward the completion of an act. Merely preparing to do something is not an attempt.

Later in the conference, defendants' counsel objected to one of the Government's proposed instructions because the instruction failed to distinguish between attempt and preparation. The judge responded that any such defect in the Government's instruction would be cured by the above instruction submitted by defendants.

Relying on what turned out to be a misrepresentation, counsel for defendants argued to the jury the distinction between attempt and preparation and requested that the jury pay particular attention to defendants' instruction. Counsel stated:

> [W]hen you listen to the instructions that the judge gives you, I want you to pay particular attention to a distinction and I think the court will draw between an attempt and just preparation. I think that the court will tell you that preparation is not an attempt. A person can be ready to do something, but unless he actually tries to make the entry, that is not an attempt. I would like you to listen closely for that instruction. . . .

During the charge to the jury the instruction in question was not given in full. Thereafter counsel for defendants objected but to no avail.[1] Counsel had been given no prior notice that their tendered instruction would be rejected by the court. Indeed, the notice counsel had received was to the effect that the jury would be given the instruction.

The judge's action was clearly contrary to the procedure required by Rule 30 of the Federal Rules of Criminal Procedure. That rule provides in relevant part:

> The court shall inform counsel of its proposed action upon the requests [for jury instruction] prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed. . . .

Notwithstanding the majority's claim that "the . . . object of the rule . . . is to require the judge to inform the trial lawyers in a fair way of what the charge is going to be" and that "the degree of specificity required by the rule, . . . need not be great," the rule vests no discretion in the judge to act in a way that is tantamount to virtual noncompliance with its directives. That is, this is not a question of degree as the majority would have it. Rather, the trial judge completely and unequivocally failed to comply with the rule, in that he did not inform counsel prior to the jury argument that he was going to reject a portion of their tendered instruction.

This noncompliance was error. The error involved, it is contended, must be found to be prejudicial such that a reversal is warranted. To this end, the majority adopts the following test for prejudicial impact: "The standard usually described is whether the party was unduly and unfairly prevented from making his argument to the jury or was substantially misled by the court's ac-

1. The instruction as given read:

The word "attempt" used in this instruction means a substantial step toward the completion of an act. To attempt an offense means wilfully to do some act in an effort to bring about or accomplish something the law forbids to be done. This act is done wilfully if done voluntarily and intentionally and with specific intent to do something the law forbids, that is to say that purpose either to disobey or to disregard the law.

tions or inaction in formulating his arguments." Whitlock v. United States, 429 F.2d 942, 946 (10th Cir. 1970). Although the majority acknowledges the difficulties in the distinction between attempt and preparation, it fails to perceive how defense counsel could be substantially misled in formulating an argument to the jury due to the judge's not giving the full instruction as he indicated in conference. The majority seemingly justifies its finding of no prejudice by arguing that the jury through a process of "negative implication" would have considered the defense of mere preparation by reason of what the judge charged in defining attempt and from that the majority reasons that it is "inconceivable that notification of the alteration in the instruction would have affected the tenor of the defense argument."

The majority attempts to distinguish defendants' main authority, Wright v. United States, 339 F.2d 578 (9th Cir. 1964), as being inapposite. I submit it is indeed apposite. In *Wright* the court forewarned defense counsel that he might not receive an instruction on his theory of the case while in the instant action counsel was not put on notice that his theory of the case would be rejected; counsel had no reason to suspect that his theory of defense would not be utilized since the court had represented that it would. The *Wright* court rejected the Government's contention that the error committed was harmless stating:

> Nor can we say that the error may be disregarded as not affecting appellant's substantial rights. Rule 52(a), Fed.R.Crim.P. Because the court failed to *clearly inform counsel* of its ruling on his requests, counsel's closing argument was based upon a theory of defense which the court rejected, or at least ignored, in its subsequent instructions. We cannot say that this

did not impair the effectiveness of counsel's argument and hence of appellant's defense. Carbo v. United States, 314 F.2d 718, 745–746 (9th Cir. 1963), and Watada v. United States, 301 F.2d 869, 870 (9th Cir. 1962), are not to the contrary, for in neither case did it appear that the failure of the court to comply with Rule 30 affected the content of counsel's argument. 339 F.2d at 580 (emphasis added).

The trial judge's failure in *Wright* was "to clearly inform counsel of its ruling" while in the instant action the trial judge failed to totally inform counsel of its ruling. Moreover, as in *Wright* the tenor of defense counsel's argument was affected in that counsel argued a theory of defense to the jury on which he was not given the operative instruction previously promised. Had defendants received notice prior to argument that the court was going to reject counsel's theory of defense on preparation, counsel would have been afforded an opportunity to recast the thrust of his argument.

The majority's attempt to diminish the underlying holding in Loveless v. United States, 104 U.S.App.D.C. 157, 260 F.2d 487 (1958), is likewise unpersuasive. *Loveless* demonstrates the need to gauge the impact of the trial court's failure to follow Rule 30 on the decision-making process of the jury. As previously noted, relying on the trial judge's representation, defense counsel here made statements to the jury requesting that they give due attention to the judge's charge on preparation. The court's failure to subsequently give such charge in full after counsel said it would, undermined the credibility of defense counsel and consequently could have had an incalculable detrimental effect on the merits of his clients' defense. Hodges v. United States, 243 F.2d 281, 284 (5th Cir. 1957).[2] More important,

---

2. The Second Circuit, in a different yet relevant context, on analyzing the impact of procedural error on the jury's decision-making process has stated in language most appropos to the instant action that the impact of such error brings "to bear in some degree, serious, although not measurable, an improper influence upon the jury, from whose deliberations every consideration other than that of the evidence and the law as expounded in a proper charge, should be excluded." United States v. Samuel Dunkel & Co., 173 F.2d 506, 510 (2d Cir. 1949).

the failure of the court to draw the distinction, after counsel had said it would, might possibly create an impression in the jurors' minds that the distinction was immaterial to their determination of the issues of fact. *See* United States v. Fernandez, 456 F.2d 638, 644 (2d Cir. 1972). As the court stated in *Loveless*, under "the circumstances of this case the least that could have been done to comply with this important rule was to afford counsel an opportunity to re-open and argue the issue . . . ." 260 F. 2d at 488. On the basis of the foregoing I would hold that defendants have made out a sufficient showing of prejudicial error warranting a new trial.[3]

Moreover, I am not convinced that an affirmative showing by defendants of

---

3. Those events however do not stand isolated for the trial judge committed further error under Rule 30 after his original failure to abide by the rule's prescriptions. The trial judge failed to follow that portion of Rule 30 which directs that:

> . . . No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury and, on request of any party, out of the presence of the jury.

Although the record is not absolutely clear on this point, it would appear that the trial judge failed to give defense counsel the requisite opportunity to assert an objection to the charge *prior to* the submission of the case for the jury's consideration. And, as our brethren in the Sixth Circuit have held, the trial judge was required pursuant to the directives of Rule 30 ". . . to give counsel time to record objections to the charge *before* the case was submitted for consideration by the jury." United States v. Nalley, 455 F.2d 259, 262–263 (6th Cir. 1972) (emphasis in original). This additional failure to comply with Rule 30 further diminished defense counsel's ability to rectify the court's prior error.

In a civil action, Hetzel v. Jewel Companies, 457 F.2d 527 (7th Cir. 1970), we addressed ourselves to this issue. The plaintiff in that action claimed that the trial judge failed to comply with the requirements of Rule 51 of the Federal Rules of Civil Procedure—the identical civil counterpart of Rule 30. Although the trial judge had informed the plaintiff well in advance of summation to the jury that plaintiff's tendered instructions would not be given and had indeed supplied plaintiff's counsel with a set of the instructions that were to be used, we held that the trial judge's actions fell short of compliance with Rule 51 and as such constituted reversible error. We stated:

> The requirement that the judge inform the parties prior to final argument of his action on requested instructions enables the parties to argue the instructions to the jury without being surprised when the instructions are given. . . .

> The practice here, while apparently adhering to the letter of Rule 51, ran somewhat counter to the intent of the rule and contravened its purpose. We are unable to determine from the record whether the parties had adequate notice of the content of the instructions which the court intended to give. Plaintiff's counsel contends he did not. Whatever the situation may have been, the rule contemplates more than technical compliance by mere notice to counsel prior to the closing arguments of the court's formal ruling on any request; it also contemplates that counsel be effectively informed of the content of the instructions which the court intends to give in a sufficiently specific fashion and sufficiently in advance of argument to allow counsel to argue the case intelligently. 457 F.2d at 535.

Moreover, in finding that the procedure utilized by the trial judge of requiring objections to the instructions prior to summation failed to comply with the directives of Rule 51, we held:

> . . . While the technique employed here of requiring counsel to register their objections to instructions in advance of the arguments is commendable for the earliness of the notice given the judge of the parties' objections, it does not fully satisfy the requirements of Rule 51. The rule's requirement that counsel state their objections with specificity necessitates deferring the process of formally stating their objections until the charge has been given in its entirety. Dunn v. St. Louis-San Francisco Ry., *supra* [10 Cir., 370 F. 2d 681]. Objections to the jury instructions must be made after the charge and *before* the jury begins its deliberation, therefore, so that the trial court may correct any errors in the instructions, including inadvertent ones which could not have been predicted prior to the charge. Moreover, for such objections to be made without prejudicing the jury against any party, they must be made out of its hearing, which would ordinarily require that the jury be absent from the courtroom. 457 F.2d 535 (emphasis added).

prejudice is necessary to render a violation of Rule 30 reversible error. In dealing with violations of the explicit and mandatory directions of Rule 30 the Fifth, Fourth, and Third Circuits have fashioned a rule that noncompliance with Rule 30 warrants reversal unless it appears affirmatively that the defendant was not prejudiced. *See* Hodges v. United States, 243 F.2d 281, 283–284 (5th Cir. 1957); Lovely v. United States, 169 F.2d 386, 391 (4th Cir. 1948); United States v. Schartner, 426 F.2d 470, 479–480 (3d Cir. 1970). In Hall v. United States, 378 F.2d 349 (10th Cir. 1967), the court went so far as to hold that failure to comply with one of the mandatory provisions of Rule 30 merited automatic reversal without the necessity for any showing of prejudice. Without passing on the wisdom of the Tenth Circuit's holding that prejudice need not be shown, I would subscribe to a standard that in effect creates a presumption of prejudice in favor of the defendant due to the trial judge's failure to follow Rule 30. Proof of prejudice is often a difficult task for although one can subjectively sense the prejudicial impact of this kind of error, it is quite another thing to articulate this intuition in cogent, objective terms. In such circumstances it is proper to draw the presumption in favor of prejudice to the defendant especially when it is considered that the error emanates from events strictly within the realm of objective determination and does not touch on subjective matters of judgment. The mandatory provisions of Rule 30 create rather simple and quite explicit procedures for the trial judge to follow; they leave no room for exception. Accordingly, failure to adhere to those provisions should create a presumption of prejudice which could only be overcome through an affirmative showing that the violation of Rule 30 does not result in prejudice to a defendant.